John R. (Bob) PARK d/b/a Action Real Estate, Plaintiff-Appellee Cross Appellant,

v.

EL PASO BOARD OF REALTORS, et al., Defendants-Appellants,

and

E. Dempsey Gunaca, et al., Defendants-Cross Appellees.

No. 83–1149.

United States Court of Appeals, Fifth Circuit.

June 24, 1985.

Rehearing Denied Aug. 14, 1985.

Grambling, Mounce, Sims, Galatzan & Harris, S. Anthony Safi, El Paso, Tex., for defendants-appellants, cross-appellees.

Jack N. Price, Austin, Tex., Harrel L. Davis, III, El Paso, Tex., for plaintiff-appellee cross-appellant.

Before GOLDBERG, JOHNSON and DAVIS, Circuit Judges.

GOLDBERG, Circuit Judge:

Owning one's own home may be the great American dream, but buying it often has more the quality of a nightmare. As the record in this case reveals, the real estate business, like man's life in the Hobbesian state of nature, can be nasty, brutish, and short. While many—indeed most—real estate brokers ply their trade honestly, relying on skill and hard work to earn their daily bread, some resort to more dubious tactics to gain an advantage over their competitors. The question that this case presents is whether the admittedly dubious tactics of the defendant-brokers also violated federal antitrust law.

On August 23, 1978, John R. Park, doing business as Action Real Estate, filed suit against the El Paso Board of Realtors and sixty-eight El Paso realty companies under Section 1 of the Sherman Act, 15 U.S.C. § 1 (1982), and Section 4 of the Clayton Act, 15 U.S.C. § 15 (1982). Park alleged that the defendants, in retaliation for his attempts to cut real estate commissions, had conspired to boycott Action Real Estate.

During the more than four ensuing years of pretrial preparation, the initial sixty-nine defendants were whittled down to eighteen.[1] Six of the remaining defendants received a directed verdict at the close of the plaintiff's evidence, leaving only twelve defendants, including the Board of Realtors, at the conclusion of the four-week trial. The jury found that all twelve of these defendants had conspired to fix prices. However, it found that only six of the defendants—the Board and five realty companies—had conspired to boycott the plaintiff. The trial court entered judgment only against these latter six defendants, on the ground that the price-fixing conspiracy had not injured the plaintiff. The court awarded the plaintiff treble damages of $2,487,677, plus interest and costs.[2]

On appeal, the Board and two realty companies[3] raise numerous grounds of error.[4] They question the sufficiency of the evidence, the size of the damage award, and various evidentiary rulings and jury instructions. In response, Park cross-appeals from the district court's refusal to enter judgment against the six real estate brokers who were found liable only for price-fixing.[5]

We agree with a number of the appellants' contentions. As to the Board, we find that there was insufficient evidence to support a holding of liability, and therefore reverse and render judgment on its behalf. As to the two individual realty companies, we hold that the trial court erred in admitting certain hearsay evidence and that the damage award did not have a rational ba-

---

1. Forty-nine defendants settled with the plaintiff prior to trial for a total amount of $295,000. Apparently, this settlement covered both the present suit and a parallel class action suit brought by Park on behalf of all persons who had sold pre-owned residential real estate in El Paso County during the limitations period.

2. This award included a credit of $295,000 for the pretrial settlement.

3. Mark I Realty, Inc., and C & H Realty, Inc.

4. Only two realty companies remain in the case, since of the five brokers against whom judgment was entered, one did not file a notice of appeal (Elaine Achez) and two have voluntarily dismissed their appeals (Moorhead, Inc., and Donald M. Love, Jr.).

5. One of these six brokers (Wayne L. Moorhead) has been dismissed from the case. The remaining five cross-appellees are E. Dempsey Cunaca, Bruce B. Shields, Raymond Baca, Cecil D. Clark, and Ralph K. Tutor.

sis. Therefore, with respect to these two appellants, we reverse and remand for a new trial. Finally, we reject the appellee's cross-appeal.

## I. BACKGROUND

Selling a home involves bringing together two parties, an owner and a buyer. Since these parties are not always naturally drawn together like metal to a magnet, both often enlist the services of real estate brokers—the owner lists his home with a broker whose job it is to publicize that the house is available for sale;[6] the prospective buyer engages the services of a broker whose job it is to find houses that fit the buyer's criteria. In the trade, the homeowner's agent is the "listing broker" and the buyer's is the "selling broker." Although the listing and the selling brokers initially represent different parties, both are ultimately compensated on a contingency basis by the homeowner. When a sale is closed, the homeowner pays a commission to the listing broker who shares it on a predetermined basis (the "commission split") with the selling broker. Typically, this commission is a percentage of the selling price of the property.

The El Paso Board of Realtors is a non-profit trade organization. At the time of trial, approximately 2000 brokers and salespeople, including the two broker-appellants, were members of the Board, roughly one half of the total number in El Paso. The principal service provided by the Board to its members is its Multiple Listing Service ("MLS"). This Service facilitates the exchange of information between listing and selling brokers, by compiling all of the listings of member brokers.[7] After obtaining a listing, member brokers are required to submit information on the property—including the sales price, the commission, and the commission split—to the MLS. A listing of property with the MLS constitutes an offer of sub-agency to other member brokers to participate in the sale. By consulting the MLS, brokers are able to determine quickly and easily what properties are on the market, the asking prices for these properties, and the commissions that they will receive for selling the properties. Approximately eighty percent of all residential resales in El Paso County are made through the Board's MLS.

John R. (Bob) Park began doing business in El Paso as Action Real Estate in 1975. Previously he had worked in El Paso as a sales person for two real estate firms and had operated real estate companies in El Paso and Denison. In contrast to the dominant practice of figuring commissions on a percentage basis, Park charged homeowners a flat fee on the theory that there is no relation between the work and expense involved in selling a home and its price. Initially, Action's flat fee was $550. Later, it was raised to $650, then to $750, and finally to $950.[8] In March of 1976, Park applied for membership with the Board and was admitted without objection. The following month he applied for membership with the MLS and was also promptly admitted. He remained a member of both the Board and the MLS for the duration of Action Real Estate's life.

Initially, Action proved highly successful. Between 1975 and 1980, Park's total sales grew from 15 to 53 to 107, with a corresponding increase in profits from $536 to $18,433. 1978, however, marked the apogee of the firm. In 1979 and 1980, sales fell off first to 70 and then to 51.[9] In 1982,

---

**6.** Under Texas law, a broker may not bring an action against a homeowner to recover a commission unless the commission agreement is in writing. Texas Real Estate License Act § 20(b), Tex.Rev.Civ.Stat.Ann. art. 6573a, § 20(b) (Vernon Supp.1985). Consequently, a real estate broker usually attempts to obtain from a property owner a written "listing agreement."

**7.** For a general description and discussion of multiple listing services, see *United States v.*

*Realty Multi-List, Inc.,* 629 F.2d 1351, 1355–56 (5th Cir.1980).

**8.** Ultimately, Park abandoned his flat fee and began charging commissions of two percent of the sales price of the property.

**9.** Despite this drop in sales, for unexplained reasons 1980 was apparently Park's most profitable year.

Park sold Action Real Estate to a former employee.

The decline and fall of Action Real Estate, like the decline and fall of empires, has provoked a multitude of warring explanations. The explanation advanced by the appellants is that Park's demise was part of a general downturn in the El Paso real estate market. Sales of residential resale property in El Paso County peaked in 1978 and declined thereafter. Between 1978 and 1982, the total number of residential resale transactions handled through the MLS fell from a high of 4,301 in 1978 to an annualized figure of only 2,518 in 1982. In large part, then, Action shared the fate of many El Paso brokers.

Park, however, saw a different hand at work—not the invisible hand of the market, but the heavy hand of his fellow brokers. According to Park, El Paso brokers had long fixed commission charges. In his view, these brokers felt threatened by his flat-fee commission and had conspired to drive him out of business. He brought suit against the Board of Realtors and sixty-eight individual brokers in August of 1978, and ultimately recovered a judgment of $2,487,677, from which the Board and two realty companies now appeal.

## II. SUFFICIENCY OF THE EVIDENCE

To establish liability for a boycott conspiracy under Section 1 of the Sherman Act and Section 4 of the Clayton Act, a plaintiff must prove: (1) that a conspiracy to boycott existed; (2) that the defendants participated in this conspiracy; (3) that the conspiracy had a sufficient nexus with interstate commerce; (4) that the conspiracy injured the plaintiff; and (5) the approximate amount of damages. The Board and the two broker-appellants challenge the sufficiency of the evidence as to each of these elements. In reviewing these claims, we apply the deferential standard of review enunciated in *Boeing Co. v. Shipman,* 411 F.2d 365 (5th Cir.1969) (en banc). If there is "substantial evidence" in support of the jury verdict—"that is, evidence of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions"—then the jury verdict must be upheld. *Id.* at 374. We consider the evidence relating to the first four elements in this part and the evidence supporting the damage award in Part IV below.

### A. Existence of the Boycott Conspiracy

It has been said that a conspiracy need not be hatched in the dark of the night by men in conical hats. Neither must it involve large oligopolies or multibillion dollar corporations. A conspiracy may also be perpetrated by the little man, wearing a business suit and operating in the broad light of day. Though such conspiracies may be less menacing than those of corporate leviathans, they are usually the most difficult to prove. If the antitrust laws are to be a legal command rather than a mere exhortation, we cannot require too high a standard of proof. We must strike a delicate balance between demanding too much and being content with too little.

In the present case, Park introduced a variety of evidence in support of his boycott claim. First, he presented evidence of practices by other real estate brokers that discriminated against him and interfered with his attempts to charge a fixed commission. For example, other brokers, when providing purchasers for Action's listings, attempted to raise the commission fee to seven percent of the selling price, despite the fact that the MLS listing by Action clearly specified a flat-fee commission. Conversely, when Action sold listings of other realtors, these brokers sometimes attempted to impose "punitive splits": rather than splitting the commission fee on the basis advertised in the MLS (usually, fifty-fifty), they offered Action a small fixed fee. Moreover, Park introduced evidence that other brokers made disparaging remarks about Action, telling prospective customers that Action was not reputable, 14 Rec. at 1089, that it was not equitable, 14 Rec. at 1114, and that it did not do a good job in selling its listings. Homeowners who listed their properties with Ac-

tion also testified that they had been harassed by anonymous telephone calls. 16 Rec. at 1521–22; 25 Rec. at 3715. Finally, Park introduced statements by other brokers to the effect that they would not show Action's listings, that they would lie to clients that Action's listings were already sold, 14 Rec. at 1218; 15 Rec. at 1278; 25 Rec. at 3714, that they would show them only as a "last resort," 16 Rec. at 1481, or that they avoided them "like the plague," 11 Rec. at 395. In one instance, there was testimony that a real estate agent had stated that Action would not survive for long because the other brokers in El Paso were going to drive Park out of business. 14 Rec. at 1115, 1127.

We find that this evidence, if admissible, was sufficient to sustain a jury finding of conspiracy to boycott. *Cf. Penne v. Greater Minneapolis Area Board of Realtors*, 604 F.2d 1143, 1148–49 (8th Cir.1979) (finding similar evidence sufficient to withstand motion for summary judgment). Although it is susceptible of different interpretations—including the defendant brokers' view that they were merely competing for customers and attempting to receive the largest possible commissions—it was for the jury to decide which of these alternative interpretations was correct. *Southway Theatres, Inc. v. Georgia Theatre Co.*, 672 F.2d 485, 493–94 (5th Cir.1982). Moreover, although the appellants point to evidence that other brokers sold a large number of Action's listings,[10] this argument goes merely to the weight of the evidence. It does not conclusively show that the de-

fendants were innocent of conspiring to boycott the plaintiff.

 The appellants contend that since the plaintiff relied on evidence of parallel conduct rather than on direct evidence of a boycott conspiracy, he was required to show that this parallel conduct was not in the realtors' self-interest. This view is not without merit. Although, as part of a larger case, evidence of consciously parallel business behavior is circumstantial evidence from which a conspiracy can be inferred, standing alone, it "has no significant probative force where the defendants can fully explain how independent business judgment would have led to such a refusal." *Southway Theatres*, 672 F.2d at 494; *see also Transource International v. Trinity Industries*, 725 F.2d 274, 281 (5th Cir.1984). Unless an antitrust plaintiff offers "evidence that tends to exclude the possibility that the [defendants] were acting independently," *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, ——, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984), an inference of conspiracy is unreasonable. *Southway Theatres*, 672 F.2d at 494; *see also Theatre Enterprises v. Paramount Film Distributing Corp.*, 346 U.S. 537, 541, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954); *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 559 (5th Cir.1980), *cert. denied*, 454 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 236 (1981); *Aviation Specialties, Inc. v. United Technologies Corp.*, 568 F.2d 1186, 1192 (5th Cir.1978).[11]

 Here, the appellants claim that given Action's low commissions, it was more lucrative for them to concentrate on selling

---

**10.** Indeed, the appellants introduced evidence (1) that of the total number of Action's listings sold between 1976 and 1980, a greater number were sold by other MLS members than by Action itself, and (2) that the percentage of Action's listings sold by other MLS members was slightly higher than the average.

**11.** This is a specific instance of the general principle that "[o]ne can infer accord from common action only if it occurs in a setting which bespeaks accord." L. Sullivan, *Antitrust* 315 (1977). The fact that all people eat, drink, are occasionally merry, and die is hardly evidence of a conspiracy. In order to present a jury

question regarding the existence of a conspiracy, an antitrust plaintiff must establish not merely consciously parallel action but a "plus factor" that indicates agreement. *Id.* at 317. Once he has met this initial burden, however—that is, once he has established a setting that bespeaks accord—then consciously parallel action is probative of the existence of a conspiracy whether or not it is potentially explicable in terms of the actor's self-interest. It is up to the jury to determine which explanation of the parallel action to accept: the explanation in terms of conspiracy or in terms of independent business judgment.

other listings. Moreover, they claim that it was in their self-interest to attempt to raise the commission if they did become involved in selling an Action home and to dissuade potential clients from listing with Action. In their view, since all of these actions can be explained in terms of their individual self-interest, the plaintiff failed to meet his burden of showing that these actions were not the product of independent business decisions.

Although this argument has some force, in the present context we ultimately disagree. Here, we are not faced with evidence that the defendants merely refused to enter into an unprofitable business relationship. Instead, the plaintiff introduced evidence that other El Paso brokers had disparaged him, had attempted to discriminate against him in the division of commissions, and had interfered with his attempts to charge a flat fee. Given both the separate jury finding that a price-fixing conspiracy existed and the evidence of widespread parallel conduct, we believe that this is a setting where common action bespeaks accord. *See supra* note 11. We hold that the evidence of parallel conduct, while not conclusive on the existence of a conspiracy, at least presented a jury question.[12]

### B. Participation in the Boycott Conspiracy

#### 1. The El Paso Board of Realtors

■ Approximately one year after establishing Action Real Estate, Park applied to be a member of the Board of Realtors and was promptly admitted. Shortly thereafter, he applied for membership in the MLS and was also admitted. Park claims that despite this evidence of cooperation, the Board participated in the conspiracy to boycott his business.

In support of this claim, Park alleges that he was denied specific benefits of Board membership—in particular, the right to have commission charges split in accordance with the MLS listings, the right to be present when contracts were presented, and the right to be free of disparagement and harassment by his fellow Board members. In our view, these allegations, without more, do not implicate the Board in the conspiracy. The Board is less than the sum of its parts: the fact that some members of the Board participated in the boycott conspiracy does not imply that the Board itself participated in the conspiracy. To support such an inference, Park needed to introduce evidence that the Board participated in or condoned the alleged rules violations. For example, Park could have attempted to show that he had brought ethics complaints concerning the alleged rules violations and that the Board had ignored or otherwise acted in bad faith on these complaints. Except in one instance, however, Park failed to bring any ethics complaints. In that instance, the Professional Standards Committee of the Board tentatively found in Park's favor, and referred the case to the Board's Court of Ethics.[13] This conduct hardly implicates the Board in the conspiracy; indeed, it indicates the reverse.

In contrast to Park, his fellow Board members were not so reticent about bringing ethics complaints. During Park's first two years of membership in the Board, four complaints were brought against him. Park claims that the Professional Standards Committee of the Board discriminated against him in the adjudication of these complaints and thereby participated in the boycott conspiracy.

After a careful examination of the record, we do not find substantial evidence to support this charge. Of the four com-

---

**12.** In addition, we note that, contrary to the appellants' assertion, the plaintiff did present direct evidence that a boycott conspiracy existed—in particular, he introduced statements by other brokers that the brokers in El Paso were going to drive Park out of business, 14 Rec. at 1115, and that the real estate profession regard-

ed him as a person not to be dealt with, 14 Rec. at 1090.

**13.** The Board stayed further action on Park's complaint as a result of the filing of the present suit.

plaints, the Professional Standards Committee found in Park's favor in one instance, found against Park in two instances, and tentatively found against Park in the final instance but referred the complaint to the Court of Ethics for final action, where it was stayed pending the outcome of the present antitrust suit. Park did not present any evidence that other El Paso Board members publicized his two ethics violations in an effort to dissuade customers from doing business with him. In the two instances where Park was found in violation of the rules, he received written reprimands by letter, but was not punished further. In one of these instances, the member who brought the complaint also received a letter of reprimand for his conduct during the transaction. Although Park strenuously objects to the Committee's findings of misconduct, he failed to present substantial evidence that the Committee acted in bad faith or abused its procedures in order to find him guilty. The only evidence presented by Park in this connection was a taped conversation with Raymond Baca, the Vice-Chairman of the Committee, who stated there was "no love lost" between Park and several Committee members and that the odds were "stacked against [Park]." 11 Rec. at 409. During the same conversation, however, Baca stated that most of the Committee members were honest and that Park had gotten a fair hearing on the complaints filed against him. *Id.* at 409–10. We do not believe that this evidence, standing alone, is sufficient to support the jury's verdict that the Board participated in the boycott conspiracy. Two reprimands do not an antitrust action make.

Finally, Park argues that the Committee's adoption of a prior offense rule in March of 1978 was specifically directed against him and was designed to force him from the Board. Under this rule, Board members who had committed two or more prior ethical violations could have their cases sent to the Court of Ethics for possible suspension or expulsion from the Board. Pursuant to this rule, the Committee referred the fourth complaint brought against Park to the Court for further proceedings, since Park had been found guilty of two previous ethical infractions. The Court, however, did not take any further action against Park, but instead stayed the proceedings during the pendency of the present suit. Except for the approximate coincidence in time of the complaints brought against Park and the adoption of the prior offense rule, there is no evidence to suggest that this rule was adopted in order to force Park from the Board. Park's attempts to characterize the rule as the "Park rule," *see* Appellee's Brief at 23, are without support in the record and are pure speculation, as is his claim that had he not brought the present suit, the Court would have acted under the rule to suspend or expel him from the Board.

Because we find that the jury's verdict against the Board was not supported by sufficient evidence, we reverse this portion of the verdict and render judgment for the Board.

## 2. The Realty Companies

■ The jury also found that five realty companies had participated in the boycott conspiracy, two of which are presently before us on appeal. In contrast to the jury's verdict regarding the Board, we find that the verdict against these two appellants was supported by sufficient evidence. There is evidence in the record that a salesman for one of the companies told a prospective customer that he would show the customer's house "only as a last resort" if it were listed with Action. 16 Rec. at 1481. Moreover, the customer testified that the salesman kept Action listings at the back of his MLS listings book. *Id.* at 1480. With respect to the other company, there was testimony that one of its salespeople disparaged Action to a homeowner, telling the homeowner that Action was not going to survive for very long because the other brokers in El Paso would drive it out of business. 14 Rec. at 1114–15. Although this evidence is sparse, we believe that a reasonable jury in the exercise of impartial judgment could conclude that these two

realty companies were participants in the boycott conspiracy.

### C. Effect on Interstate Commerce

The appellants next argue that Park failed to introduce sufficient evidence that the boycott conspiracy affected interstate commerce. We disagree. Under *McLain v. Real Estate Board of New Orleans,* 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980), an antitrust plaintiff need demonstrate only "a substantial effect on interstate commerce generated by [the defendants'] brokerage activity." *Id.* at 242, 100 S.Ct. at 509. He need not make "the more particularized showing of an effect on interstate commerce caused by the alleged conspiracy...." *Id.* As the Supreme Court explained, "If establishing jurisdiction required a showing that the unlawful conduct itself had an effect on interstate commerce, jurisdiction would be defeated by a demonstration that the alleged restraint failed to have its intended anticompetitive effect. This is not the rule of our cases." *Id.* at 243, 100 S.Ct. at 509.

Here, the plaintiff introduced substantial evidence that the actions of El Paso real estate brokers had a significant effect on interstate commerce through the financing of real estate loans, the furnishing of title insurance, and the advertising of properties for sale. This is precisely the kind of involvement with interstate commerce that the Court found sufficient in *McClain. Id.* at 245, 100 S.Ct. at 510–11. "Ultimately, whatever stimulates or retards the volume of residential sales, or has an impact on the purchase price, affects the demand for financing and title insurance, those two commercial activities that on this record are shown to have occurred

in interstate commerce." *Id.* at 246, 100 S.Ct. at 511. Unlike in *Alabama Homeowners v. Findahome Corp.,* 640 F.2d 670 (5th Cir.1981), where the alleged conspiracy involved only two firms, neither of which was shown to have any involvement with interstate commerce, *id.* at 674, here the conspiracy was alleged to have involved a large part of the El Paso realty market. In a conspiracy case, the plaintiff need not show that the business of each individual member of the conspiracy had a substantial effect on interstate commerce, as long as the coconspirators in general had such an effect. This is what the jury implicitly found here.[14]

### D. Fact of Injury

Finally, the appellants challenge the sufficiency of the plaintiff's proof that he was in fact injured by the boycott conspiracy. As discussed below, we have serious questions regarding the amount of damages awarded by the jury; in brief, we do not believe that the jury's award of $927,559 had a reasonable basis. We think it clear, however, that the plaintiff adequately established the fact of injury. From the plaintiff's evidence, the jury was entitled to infer that the plaintiff would have attracted more listings, sold more properties, and earned more profits had the boycott not existed. This being so, the plaintiff did not need to prove that he had been injured by any particular instance of a refusal to deal.[15]

## III. EVIDENTIARY ISSUES

The appellants raise two issues relating to the admission of evidence. First, they argue that the trial court admitted evidence

---

**14.** The appellants also raise an objection to the form of the special interrogatory regarding interstate commerce. They claim that because the interrogatory did not distinguish between the price-fixing and the boycott conspiracies, it is possible that the jury found only that the price-fixing activities had had a substantial effect on interstate commerce. Because we reverse and remand on other grounds, we need not consider this question here. We assume that, on remand, if the district court again submits special

interrogatories, it will ask the jury specifically whether the activities affected by the boycott conspiracy had a substantial effect on interstate commerce.

**15.** In our view, all of the appellant's arguments regarding proof of the fact of damages relate instead to the size of the damage award. They do not show that the plaintiff did not sustain any injury.

under the coconspirator hearsay rule, Fed. R.Evid. 801(d)(2)(E), without making the required *James* findings. *See United States v. James*, 590 F.2d 575, 582–83 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). Second, they argue that the trial court improperly admitted a number of taped telephone conversations that purportedly were obtained through deception and in violation of a local telephone tariff. We agree with the appellants regarding the first of these issues, and therefore reverse and remand for a new trial. Because the second issue may arise on retrial, we also consider it briefly.

### A. James *Error*

Under Fed.R.Evid. 801(d)(2)(E), evidence is not hearsay if it is offered against a party and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Although Rule 801(d)(2)(E) codified a long-standing exception to the hearsay rule, it altered the allocation of responsibility between the judge and the jury in determining whether the exception applied. Prior to the adoption of the Federal Rules, the admission of coconspiratorial hearsay was governed by the rule of *United States v. Apollo*, 476 F.2d 156 (5th Cir.1973). The judge's role was merely to make a preliminary determination whether the proposing party had established a "prima facie case"—*i.e.*, evidence sufficient to support a finding by the jury that the conspiracy existed and that the declarant and the defendant against whom the statement was offered were members of the conspiracy. *See United States v. Oliva*, 497 F.2d 130, 132–33 (5th Cir.1974). If the judge made this determination, it was then the jury's responsibility to determine whether a conspiracy in fact existed, whether the defendant and declarant were members of the conspiracy, and whether the statement was made during the course and in furtherance of the conspiracy.

As we held in *James*, however, the adoption of the Federal Rules of Evidence in 1975, by giving the trial judge the sole responsibility for determining the admissibility of coconspiratorial hearsay, required that we overrule the *Apollo* procedures. 590 F.2d at 578–80. Because the judge now no longer shares responsibility with the jury for determining the admissibility of the evidence, it is no longer sufficient for him to make merely a preliminary determination about whether the proposing party has established a prima facie case. Instead, he must determine himself whether all of the conditions for the admission of the evidence have been met. *Id.* at 579–80. *James* counsels that, initially, the trial judge should make this determination when the hearsay evidence is offered, using a "substantial, independent evidence" standard. *Id.* at 581. Regardless, however, of whether the judge makes this preliminary determination or whether he admits the evidence subject to it later being "connected up," *James* requires that at the conclusion of all the evidence, the trial court must determine as a factual matter "whether the [proposing party] has shown *by a preponderance of the evidence* independent of the statement itself (1) that a conspiracy existed, (2) that the coconspirator and the defendant against whom the coconspirator's statement is offered were members of the conspiracy, and (3) that the statement was made during the course and in furtherance of the conspiracy.... If the court concludes that the [plaintiff] has not borne its burden of proof on these issues, the statement cannot remain in the evidence to be submitted to the jury." *Id.* at 582–23 (emphasis added).

Although *James* was itself a criminal case, "the court's construction of the requirements of Rule 801(d)(2)(E) was not based upon considerations unique to criminal actions." *Paul F. Newton & Co. v. Texas Commerce Bank*, 630 F.2d 1111, 1121 (5th Cir.1980). For this reason, we have adopted the *James* rules in the civil context. *Id.* In doing so, however, we noted "that the district court's discretion in controlling the order of proof may be broader where a party seeks to introduce coconspirators' statements in a civil action rather than a criminal proceeding since the

concern of avoiding any possible prejudice to a party from the admission of evidence later determined to be inadmissible is not as strong in the civil context." *Id.*

Here, the trial court declined to make a *James* finding when the hearsay statements of the alleged coconspirators were offered. 5 Supp.Rec. at 167–68. Given the discretion conferred on trial courts in civil cases to control the order of proof, *Paul F. Newton,* 630 F.2d at 1121, this decision was not erroneous. The district court could properly allow the evidence to be introduced subject to it later being connected up. *United States v. Winship,* 724 F.2d 1116, 1121 (5th Cir.1984).

At the conclusion of all the evidence, however, the trial court was required to determine whether the plaintiff had established a *James* predicate by a preponderance of the independent, non-hearsay evidence. Despite motions by the defendants' counsel, the trial court failed to do so.[16] Instead, it merely determined that "there is a prima facie case shown, number one, of the existence of a conspiracy, and number two, of the membership of the Defendants on trial and other coconspirators in it, and that there is sufficient evidence to go to the jury on that for their decision." 25 Rec. at 3733. Later, the district court instructed the jury to determine, from a preponderance of the independent, non-hearsay evidence, whether a conspiracy existed, whether the particular declarant was a member of the conspiracy, and whether the offered statements were made in the course and furtherance of the conspiracy. 25 Rec. at 3883. In applying the now-defunct *Apollo* rule regarding a prima facie case, rather than determining by a preponderance of the evidence whether the plaintiff had established a *James* predicate, the trial court erred.[17]

The *James* rule serves an essential function in upholding the integrity of the hearsay rule. It must not be banished to the purgatory of sporadic application. In the present case, because the hearsay statements of alleged coconspirators constituted a large proportion of the plaintiff's evidence, and because we do not believe that, as a matter of law, a *James* predicate was established, we cannot say that the trial court's error was harmless. Consequently, with respect to the liability of the two real estate companies, we are compelled to reverse and remand for a new trial. *See DeRoche,* 726 F.2d at 1029 (reversing and remanding for new trial due to failure to make *James* finding).

## B. Deception

The appellants also argue that the trial court erroneously admitted into evidence various taped telephone conversations between Park or his daughter and other El Paso real estate brokers. In these conversations, Park and his daughter posed as prospective sellers and attempted to elicit from other brokers comments concerning Action Real Estate and its flat-fee commission system. The appellants claim that since these tapes were deceptively obtained and violated the local telephone tariff requiring the use of a beeper when taping a telephone call, they should have been excluded.

The applicability of the exclusionary rule to civil cases has been the subject of considerable controversy. *See generally Jonas v. City of Atlanta,* 647 F.2d 580, 587–88 (5th Cir.1981); *McCormick on Evidence* 370–71 (E. Clearly 2d ed. 1972). "In the complex and turbulent history of the rule, the [Supreme] Court never has applied it to exclude evidence from a civil proceeding, federal or state." *United States v. Janis,*

---

**16.** Where the defense counsel has failed to move for a *James* ruling at the close of all the evidence, we have limited our review of the district court's actions to the plain error rule. *United States v. DeRoche,* 726 F.2d 1025, 1028 (5th Cir.1984). Here, however, the defense counsel clearly did meet its burden of requesting a *James* ruling. 25 Rec. at 3730–32.

**17.** The present case is thus distinguishable from *Winship,* where the trial court failed to articulate its *James* findings but implicitly applied the correct legal standard. *See Winship,* 724 F.2d at 1121–22.

428 U.S. 433, 447, 96 S.Ct. 3021, 3029, 49 L.Ed.2d 1046 (1976). "[W]hether the exclusionary rule may ever bar the introduction of evidence in a civil trial is uncertain." *Jonas*, 647 F.2d at 587; *see also City of Waco v. Bridges*, 710 F.2d 220, 225 (5th Cir.1983) (generally, exclusionary rule *not* applicable in civil cases), *cert. denied*, —— U.S. ——, 104 S.Ct. 1414, 79 L.Ed.2d 741 (1984).

 In the present case, we believe that the district court properly declined to apply the exclusionary rule. Where evidence is obtained in violation, at most, of a local telephone tariff, the public interest in deterrence does not outweigh the benefit of providing the factfinder with all of the relevant testimony.[18] Although some states have expressed a policy against the admission of evidence obtained through the covert taping of telephone conversations, *see, e.g., Markham v. Markham*, 272 So.2d 813 (Fla.1973), no similar federal policy has heretofore been expressed. Indeed, the Omnibus Crime Control and Safe Streets Act of 1968 § 802, 18 U.S.C. § 2511(2)(d) (1982), makes an explicit exception to the general rule prohibiting the interception of telephone conversations where, as here, one of the parties to the conversation consents to the interception and the purpose of the interception is not to commit any criminal, tortious, or other injurious act.[19]

The cases cited by the appellants do not contradict this conclusion. In both *Cataphote Corp. v. Hudson*, 422 F.2d 1290 (5th Cir.1970), and *Trans-Cold Express v. Arrow Motor Transit*, 440 F.2d 1216 (7th Cir.1971), the courts merely upheld the exclusion of deceptively obtained evidence as being within the trial court's discretion. *See Cataphote Corp.*, 422 F.2d at 1296;

*Trans-Cold Express*, 440 F.2d at 1219. Neither opinion suggests that had the trial court admitted the evidence, the appellate court would have reversed. Indeed, to the extent that these cases stand for the proposition that the admission of deceptively obtained evidence is within the sound discretion of the trial court, they support the view that the court below was entitled to admit the disputed tape recordings. On remand, we leave the admissibility of the tape recorded conversations to the sound discretion of the trial court.

## IV. AMOUNT OF DAMAGES

After finding six of the defendants liable for conspiracy to boycott, the jury awarded the plaintiff $927,559 in damages for past and future lost profits for the period from 1978 to 1991. The appellants claim that this damage award was not supported by substantial evidence and was excessive. Because the issue may arise again on remand, we feel it appropriate to express our reservations concerning the amount awarded to the plaintiff.

 In reviewing a jury's damage award, we enter "into the realm of the imprecise and the uncertain." *Lehrman v. Gulf Oil Corp.*, 464 F.2d 26, 45 (5th Cir.), *cert. denied*, 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972); *see also Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123–24, 89 S.Ct. 1562, 1576–77, 23 L.Ed.2d 129 (1969); *Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 434 (5th Cir. 1985). "An exacting burden of proof on antitrust damages ... would render nugatory the value of private enforcement of the antitrust laws and would reward antitrust violators for particularly egregious conduct" by which they not only violated the law but also deprived the plaintiffs of

---

**18.** In this respect, the present case differs from cases where the evidence in question was obtained *not merely in violation of a telephone tariff*, but in violation of a party's fourth amendment rights.

**19.** In the present case, the plaintiff's purpose for taping the telephone conversations was to preserve evidence for trial. In our view, this purpose is not an "injurious act" within the meaning of § 2511(2)(d). *Cf. Moore v. Telfon Com-*

*munications Corp.*, 589 F.2d 959, 966 (9th Cir. 1978) (Congress did not intend to prohibit recording a conversation when the purpose of the recording is to preserve evidence of extortion); *Meredith v. Gavin*, 446 F.2d 794, 799 (8th Cir. 1971) (Congress intended only to prohibit use of an intercepted conversation "in a manner in which the offending party had no right to proceed").

direct evidence of damages. *Id.* For this reason, we use a relaxed standard in reviewing a jury's award of damages. Once a plaintiff has proved by a preponderance of the evidence the fact of injury, a jury may use its discretion in determining the exact amount of damages resulting from the antitrust violation. *Id.* at 435; *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 989 & n. 8 (5th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984). "Under this relaxed burden, a jury verdict may stand on less evidence than is normally required to support a damage award in civil cases." *Pierce*, 753 F.2d at 435.

▮▮▮ At the same time, however, we do not abdicate altogether our duty to review damage awards. Although an antitrust expert "need not be armed on the right hand with a slide rule, on the left with a computer," *Terrell v. Household Goods Carriers' Bureau*, 494 F.2d 16, 25 (5th Cir.), *cert. dismissed*, 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974), he cannot indulge in "fantasy." *Id.* His assumptions and projections must rest on "adequate bases," *id.* at 24, *quoted in Pierce*, 753 F.2d at 438, and cannot be the product of mere speculation, *Pierce*, 753 F.2d at 438. "[E]ven under a relaxed burden of proof, there must be a rational basis by which a jury can assess the amount of antitrust damages or the award cannot stand." *Multiflex*, 709 F.2d at 995.

In support of his damage claim, the plaintiff relied solely on the testimony of an expert witness, Dr. George. Dr. George calculated the plaintiff's damages by estimating how much Action Real Estate would have grown in the absence of the boycott. He theorized that the low commission prices offered by the plaintiff would have induced homeowners to list their properties with Action, that as a result Action would have captured twenty percent of the El Paso real estate market by 1983, and that the plaintiff would have

realized profits of thirty percent on his total revenues.

After a careful review of Dr. George's testimony, we find that several aspects of his damages model lack a rational basis. First, Dr. George projected that due to its lower commission charges, Action would have continued to grow until other firms began to engage in price competition. He assumed that this would have occurred when Action had captured twenty percent of the real estate resale market. 19 Rec. at 2409–11. Dr. George gave absolutely no basis, however, for these assumptions. He did not introduce evidence that homeowners base their choice of real restate brokers primarily on price, nor did he introduce evidence that the other brokers in El Paso would not have competed at an earlier point to protect their market shares, *see Household Goods Carriers' Bureau v. Terrell*, 452 F.2d 152, 160 (5th Cir.1971) (expert testimony regarding market penetration relied on the "totally unsubstantiated assumption that the [defendant] would not take competitive steps" to protect its position). He did not study other real estate markets to see how they behaved, 20 Rec. at 2702, and admitted that he did not know of any real estate firm in the country that had a twenty percent market share, *id.* at 2702–03. Indeed, he was unaware of any realty firm that had larger than a six-and-one-half percent market share, the share of the largest firm in El Paso in 1979. *Id.* at 2701, 2703.[20]

Second, Dr. George estimated that the plaintiff's profit rate would have been thirty percent during the entire damages period. He calculated this figure by averaging the figures on the plaintiff's 1976 to 1980 income tax returns. Although this estimate, unlike Dr. George's estimate of market share, had at least some basis, we find that it did not have a *rational* basis. During the 1976 to 1980 period, Action Real Estate had only a couple of salesmen, one of whom was the plaintiff. Consequently, the "profits" reported on the plaintiff's tax

**20.** A twenty percent market share would have made Action Real Estate the size of the largest

*four* real estate firms combined in El Paso in 1980. 23 Rec. at 3328.

returns represented, in large part, a return on his labor—they were earned from sales handled by the plaintiff himself.[21] As Action Real Estate grew to a twenty percent market share, however, a smaller and smaller percentage of its sales would have been handled by the plaintiff. The relevant calculation of profit rate, therefore, is not the plaintiff's profit rate from his own sales, but his profit rate from sales handled by other salesmen. The plaintiff's expert did not make any calculation of this amount.[22]

▮ Generally, an antitrust plaintiff can prove lost profits by two methods: (1) the "before and after" method, which "involves comparing records of profits earned by the plaintiff prior to the impact of the violation with those subsequent to it;" and (2) the "yardstick test," which "consists of studies of the profits of firms closely comparable to plaintiff's." Note, *Private Treble Damage Antitrust Suits: Measure of Damages for Destruction of All or Part of a Business*, 80 Harv.L.Rev. 1566, 1574–75 (1967); *see Pierce*, 753 F.2d at 439; *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 667 (5th Cir.1974), *cert. denied*, 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400 (1975). Here, the plaintiff's expert did not utilize either of these methods. The plaintiff's most profitable year ever was 1980, and his second most profitable year 1978, both years during which the boycott allegedly was in force. Dr. George thus could not compare the plaintiff's profits before and after the violation to compute damages. But Dr. George also did not use the alternative method of studying the profits of firms closely comparable to the plaintiff's. He did not examine the record of realty firms that charged fixed commissions either in El Paso or in other cities in order to determine their market shares and profit rates.

▮ Instead, Dr. George merely "estimated" that the plaintiff's firm would capture twenty percent of the real estate resale market in El Paso and that thirty percent of the plaintiff's revenues would be profits. Although a plaintiff is not limited to the before and after method or the yardstick test of lost profits, but can instead use a method of proof "specially tailored" to the individual case, *Lehrman*, 500 F.2d at 668, he cannot engage in pure speculation. On remand, the plaintiff must present a revised damages model, with a rational basis for each of the model's principal assumptions.[23]

## V. COUNTERCLAIM

▮ To establish Sherman Act liability, a plaintiff need prove only that the defendants conspired illegally to restrain trade. However, "[p]roof of a violation of the Sherman Act standing alone does not establish civil liability under § 4 of the Clayton Act [15 U.S.C. § 15 (1982)]. There must under § 4 be proof of 'injury to business or property' before a Sherman Act

---

**21.** The highest profit reported by the plaintiff in any year was approximately $20,000. In view of the fact that the plaintiff claimed to be working full-time in the realty business, this "profit" is more likely to represent a return on the plaintiff's labor than a profit from sales by his subordinates.

**22.** Our analysis of the logical defect in Dr. George's calculation of profit rate is confirmed by an examination of the profit rates of other real estate firms. The defendants introduced uncontradicted evidence that the average profit rate for real estate brokerage firms nationally for the 1975 to 1980 period was only five percent. 24 Rec. at 3541–42. The highest profit rate cited by the plaintiff for another brokerage firm in El Paso was twenty-six percent, and that was for only a single year, not for a sustained

period. 20 Rec. at 2539. Dr. George failed to give any credible explanation of how a firm could provide roughly the same services as other firms, charge a third of the price, and earn a higher profit rate. Even were the plaintiff the Henry Ford of the realty industry, we are doubtful that he could have achieved threefold economies of scale.

**23.** In addition, since the exact number of residential resales in El Paso can now be determined for much of the damages period, the plaintiff should incorporate these figures into his model rather than rely on projections as he did previously. The plaintiff should also use actual figures rather than projections for the home resale inflation rate, when calculating the commissions he would have received for his lost sales.

violation becomes cognizable as a private civil remedy ... [A]wareness of the distinction between conduct which violates § 1 of the Sherman Act, and the elements which establish liability in private party litigation under § 4 of the Clayton Act, is vital." *Multiflex, Inc. v. Samuel Moore & Co.,* 709 F.2d 980, 987 n. 7 (5th Cir.1983) (quoting *Alabama v. Blue Bird Body Co.,* 573 F.2d 309, 317 & n. 17 (5th Cir.1978)), *cert. denied,* —— U.S. ——, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984).

In the present case, the district court found that the plaintiff failed to prove that he had been injured by the defendants' price-fixing conspiracy, and therefore declined to enter judgment against those defendants who were found liable only of price-fixing. The plaintiff cross-appeals from this determination, claiming that it is contrary to the jury finding of injury. We reject this cross-appeal.

The special interrogatory submitted to the jury regarding injury was far from a model of clarity. It was predicated on an affirmative response to either the price-fixing *or* the boycott interrogatory, and asked, "Do you find from a preponderance of the evidence that Plaintiff sustained any injury to his business or property which was directly and proximately caused by the combination or conspiracy?" 8 Rec. at 2083. Because it did not require the jury to specify which conspiracy had injured the plaintiff, it is possible that the jury, in answering the interrogatory affirmatively, believed that only the boycott conspiracy had injured the plaintiff.

 Under Rule 49(a) of the Federal Rules of Civil Procedure, if the trial court, when submitting special interrogatories to the jury, "omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issue so omitted unless before the jury retires he demands its submission to the jury." Here, the trial court omitted sending to the jury the issue of whether the price-fixing conspiracy, in particular, injured the plaintiff. Because the plaintiff did not object to this omission, *see* 25 Rec.

at 3735–36, he waived his right to a jury trial regarding the issue and cannot now object on appeal. *J.C. Motor Lines v. Trailways Bus System,* 689 F.2d 599, 602 (5th Cir.1982).

When an issue is not submitted to the jury, the trial court may make a finding regarding that issue. Fed.R.Civ.P. 49(a). "[I]f it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict." *Id.* Here, the district court implicitly made a finding that the price-fixing conspiracy did not injure the plaintiff. It stated, "Plaintiff's evidence with respect to damages ... was that his lost profits and the ultimate loss of his entire business were caused by the boycott in which the Defendants were alleged to have engaged. He is therefore entitled to antitrust damages only against those Defendants found by the jury to be members of *both* conspiracies; *i.e.,* to fix commissions and to boycott the Plaintiff." 8 Rec. at 2087.

 In reviewing the district court's finding that the plaintiff was not injured by the price-fixing conspiracy, we apply the clearly erroneous standard of review, *J.C. Motor Lines,* 689 F.2d at 602; *Murtagh v. University Computing Co.,* 490 F.2d 810, 817 (5th Cir.), *cert. denied,* 419 U.S. 835, 95 S.Ct. 62, 42 L.Ed.2d 62 (1974), and uphold the district court's finding. The plaintiff alleged that the defendant-brokers set an artificially high price for commissions. However, it is difficult to see how this price-fixing, in itself, could have injured the plaintiff. Setting an artificially high price for a product potentially harms consumers; but normally one would not expect it to harm competitors who try to undercut the set price. Quite the reverse: price fixing ordinarily helps these competitors by allowing them to capture a larger share of the market than they would if the prevailing price were lower. *See Malcolm v. Marathon Oil Co.,* 642 F.2d 845, 852 (5th Cir.), *cert. denied,* 454 U.S. 1125, 102 S.Ct. 975, 71 L.Ed.2d 113 (1981); Note, *Private Treble Damage Antitrust Suits: Measure of Damages for Destruction of All or Part of*

*a Business,* 80 Harv.L.Rev. 1566, 1573 (1967) ("[P]roof of a conspiracy fixing resale prices in the industry might suggest that a plaintiff retailer benefited from the artificially inflated prices."). This was indeed one of the bases of Dr. George's assumption that the plaintiff should have captured a twenty percent market share. While we do not hold that a plaintiff might not be able to show, in certain instances, that he was hurt by the price-fixing conspiracy of his competitors, we do not believe that the plaintiff has done this here.

Because we do not disturb the district court's implied finding that the price-fixing conspiracy did not injure the plaintiff, we hold that the district court properly refused to enter judgment against the six defendants who were exonerated of the boycott conspiracy.

## VI. CONCLUSION

Generally, we are reluctant to disturb a jury verdict, particularly one that is the product of a four-week trial. This case, however, proves that even the most sacrosanct of presumptions has its exceptions. After combing a voluminous record, we are left with the conviction that the jury's verdict was deficient in two respects: There was inadequate evidence that the Board participated in the boycott conspiracy and that the conspiracy caused the plaintiff nearly one million dollars in damages. In addition, we find that the trial court improperly admitted out-of-court statements by alleged coconspirators without making the required *James* findings. We therefore reverse and render judgment for the Board, and reverse and remand for a new trial for the two broker-appellants.

REVERSED AND RENDERED IN PART AND REVERSED AND REMANDED IN PART FOR A NEW TRIAL.